**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JAMES LANTZ**,

            Plaintiff,

    v.

**U.S. DEPARTMENT OF COMMERCE and**
**U.S. PATENT & TRADEMARK OFFICE**,

          Defendants.

Case No. 17-cv-940 (CRC)

---

## <u>MEMORANDUM OPINION</u>

Kale is everywhere.  Even Chick-fil-A, the fast-food chicken chain, has begun serving the green—its "Superfood Side" features kale amid a blend of broccolini, roasted nuts, and dried cherries.  But while the restaurant has come around to kale, it has no appetite for a certain slogan that may have contributed to the vegetable's rise.  Namely, when Vermont-based T-shirt designer Bo Muller-Moore filed an application to trademark the phrase "Eat More Kale" in 2010, Chick-fil-A sent a letter telling him to stop selling merchandise bearing the phrase and urged the federal government to deny his application.  The restaurant claimed that consumers would confuse "Eat More Kale" with its own trademarked catchphrase, "Eat Mor Chikin."[1]  Muller-

---

[1] As in:



Moore pressed on, his battle with Chick-fil-A went viral, and, in the end, the U.S. Patent and

Trademark Office ("USPTO") granted him the trademark.  See Abby Ohlheiser, "Eat More

Kale" Guy Wins Trademark Battle with Chick-fil-A, Wash. Post (Dec. 12, 2014),

https://perma.cc/XSJ9-KWXL.

The plaintiff in this case, James Lantz, is producing a documentary about this saga.  He

filed a request under the Freedom of Information Act ("FOIA") seeking documents related to the

"Eat More Kale" trademark application.  In response, USPTO released some 160 pages of

emails—some with redactions—and withheld a few pages in their entirety pursuant to one of

FOIA's exemptions.  Lantz then filed this lawsuit, contending that USPTO did not adequately

search for records and improperly withheld responsive emails.  The parties have both moved for

summary judgment.  For the following reasons, the Court will grant USPTO's motion and deny

Lantz's.

## I.   Background

Lantz filed a FOIA request with USPTO in October 2015 seeking:

> copies of emails within the USPTO system that concern Trademark Application
> serial number 85412053 . . . for the mark, 'Eat More Kale' or contain any of the
> following phrases and/or names: 'Eat More Kale', "Bo Muller-Moore' or 'Robert
> Muller-Moore' (the applicant) which may be listed as 'Muller-Moore, Robert' or
> 'Muller-Moore, Bo' or 'Daniel Richardson' which may be listed as 'Daniel P.
> Richardson' or 'Ashlyn Lembree' which may be listed as 'Ashlyn J. Lembree'
> (the attorneys of record)

Decl. of Kathryn Siehndel Supp. Defs.' Mot. Summ. J. ("Siehndel Decl.") Ex. D.

USPTO identified two offices that could have the requested records and instructed nine

employees to conduct searches.  Siehndel Decl. ¶ 12.  The agency ultimately collected 45 pages

of responsive records.  Id. ¶ 17.  It declined to release three pages pursuant to FOIA Exemption

5, which allows agencies to withhold information that would be privileged in civil litigation. USPTO released the remaining pages with some redactions.  Id.

Lantz appealed USPTO's response within the agency, contending that it did not conduct an adequate search for responsive records and challenging the agency's reliance on Exemption 5. Id. at ¶ 22.  USPTO responded by having two more employees conduct searches, which produced 52 additional pages of records.  Id. at ¶ 23.  Still unsatisfied, Lantz in May 2017 filed this suit against USPTO (and its parent, the Department of Commerce) raising the same two arguments as in his agency appeal.  Compl. ¶ 13.  USPTO conducted yet another search, this time working with its IT department to recover emails from a failed hard drive.  Siehndel Decl. ¶ 28.  The agency came up with about 70 additional pages.  Id. at ¶ 30.

All told, USPTO's three searches generated 164 pages of emails.  Siehndel Decl. ¶ 31. The agency released 116 pages in full and, relying on Exemption 5, it withheld five pages in their entirety and redacted information from 43.[2]  Id.; see also id. Ex. A (Vaughn index).  The parties have now both moved for summary judgment, and those motions are ripe for review.

## II.   Standard of Review

FOIA requires federal agencies to produce their records upon request unless one of the statute's nine exemptions applies.  See 5 U.S.C. § 552(b).  Disputes about the adequacy of an agency's search for documents or about the invocation of FOIA exemptions are properly decided on motions for summary judgment.  See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011); Oglesby v. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  Summary judgment is appropriate when the pleadings and record show "that there is no genuine dispute as

_____

[2] USPTO also redacted information on several pages pursuant to Exemption 6, which protects personal information in the interest of privacy.  See 5 U.S.C. § 552(b)(6).  Lantz does not challenge those redactions.

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). In the FOIA context, "summary judgment may be granted on the basis of agency

affidavits if they contain reasonable specificity of detail rather than merely conclusory

statements, and if they are not called into question by contradictory evidence in the record or by

evidence of agency bad faith." Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d 283, 287

(D.C. Cir. 2006).

### III. Analysis

Again, Lantz contends that USPTO's search was inadequate and that its reliance on

Exemption 5 was improper. The Court takes (and rejects) these contentions in turn.

### A. Adequacy of the Search

To establish the adequacy of a search, an agency "must show that it made a good faith

effort to conduct a search for the requested records, using methods which can be reasonably

expected to produce the information requested." Oglesby, 920 F.2d at 68 (D.C. Cir. 1990).

Affidavits or declarations that "adequately describe the agency's search"—such as by stating the

search terms used and type of search conducted—satisfy this burden. Id. An agency does not

need to search all of its records, but it must "aver[] that all files likely to contain responsive

materials (if such records exist) were searched." Id.

Kathryn Siehndel, who served as USPTO's FOIA Officer at the time of Lantz's request,

has filed two affidavits describing the agency's search procedures. The process described in Ms.

Siehndel's declarations strike the Court as adequate. Lantz, however, points to six deficiencies

that he claims undercut its adequacy:

First, Lantz points to the fact that USPTO's search did not turn up several emails that he

knows exist through independent means. Specifically, the agency produced an internal email

written by Andrew Lawrence—a managing attorney who took the lead on the "Eat More Kale" application—mentioning that he had "received over 20 emails" from Muller-Moore's supporters asking that USPTO grant his application. Siehndel Decl. Ex. B, at 91–92. Lantz is also aware of an email from Muller-Moore to Lawrence saying that the latter could "take as long as he wants" with the application. Decl. of James Lantz Supp. Pl.'s Mot. Summ. J. ¶ 5. And he points to an email he sent to Lawrence that similarly has not turned up. Id.

The adequacy of a search, however, is dictated by "the appropriateness of the methods," not "the fruits of the search." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). And Lantz has not offered any evidence undermining the sworn assertion that Mr. Lawrence searched for these emails in good faith, came up empty, and then double-checked his files during this litigation. Suppl. Decl. of Kathryn Siehndel ("Siehndel Suppl. Decl.") ¶ 8. Lawrence indeed provides a plausible explanation for their absence: because none of the identified messages would bear on the trademark application decision, Lawrence may have deleted them before Lantz's FOIA request. Suppl. Decl. of Kathryn Siehndel ("Siehndel Suppl. Decl.") ¶ 11. The Court is not convinced that the failure to produce these particular records means that USPTO's search was inadequate.

Second, Lantz finds it suspicious that 98% of the produced emails were sent between 2011 and 2013. Given the "great deal of activity" in the case from 2014 to 2015—including Chick-fil-A's formal opposition to the application and USPTO's ultimate grant of the trademark—Lantz urges that there should be more emails from that time period. Id. at 5. But while there may have been many formal entries on the "Eat More Kale" application docket between 2014 and 2015, Lantz provides no reason to believe that the email volume during that time period would be commensurately high. Siehndel Suppl. Decl. ¶ 10. To the contrary, Ms.

Siehndel explains that emails related to trademark applications—to the extent there are any—typically spike when the application is first received.  Id.  And with "Eat More Kale" in particular, the public's interest seemed to peak shortly after Chick-fil-A sent its 2011 cease-and-desist letter.  So it makes sense that the lion's share of emails would date from 2011 to 2013.

Next, Lantz identifies several deficiencies in USPTO's search as described by Ms. Siehndel.  He claims that in searching for the names of individuals, USPTO should have searched for both first and last names rather than just the latter.  He objects to USPTO's searching for a "combination" of terms in Microsoft Outlook because that technique will produce only emails containing *all* of the listed terms.  And he argues that the agency may have missed emails by searching only relevant Outlook folders, as messages may have been archived elsewhere (for example, on a network drive or cloud server).  But USPTO has provided satisfactory explanations for each of these claimed deficiencies.  Emails containing only the first name of an individual were almost certainly captured by searches for emails containing the terms "Eat More Kale," "Kale," or the application number.  The government admits that its reference to searching for a "combination" of terms was misleading; the agency has confirmed that it searched each term separately to capture emails that contained *any* of the listed terms.  Siehndel Suppl. Decl. at ¶ 12.  And the employees who conducted searches had access to all of their emails through Microsoft Outlook, regardless of whether the emails were stored on the computer's hard drive, the agency network, or cloud-based storage.  Id. at ¶ 13–14.  Lantz's claimed deficiencies do not undermine the adequacy of USPTO's search.

Finally, Lantz believes that more USPTO employees should have been enlisted to conduct searches.  He has gleaned that a total of 39 employees sent or received responsive emails, and yet only 11 employees conducted searches.  But as the agency explains, the fact that

a name appears on an email chain—*i.e.*, the mere fact that the individual received the email—
does not suggest that the person is likely to hold additional responsive emails.  Lantz also raises a
related (and more particularized) objection: that USPTO should have required the former
Commissioner of Trademarks, Deborah Cohn, to search her files for responsive emails.  But
USPTO responds, and the Court agrees, that it had no reason to expect that Ms. Cohn would
have responsive records (beyond emails caught by other searches, of which she was the
recipient).  With the high number of trademark applications that the agency receives each year, it
is extremely unlikely that the head of the Trademarks Office would become personally involved
in a particular application.  Defs.' Mot. Summ. J. at 9.

In sum, the Court is convinced that USPTO conducted a search that it "reasonably
expected to produce the information requested." Oglesby, 920 F.2d at 68.  Its search was
adequate for purposes of FOIA.

B.  Withholding Under Exemption 5

Lantz also objects to USPTO's reliance on FOIA Exemption 5 in withholding responsive
information.  Exemption 5 allows an agency to withhold "inter-agency or intra-agency
memorandums or letters which would not be available by law to a party other than an agency in
litigation with the agency." 5 U.S.C. § 552(b)(5).  "Courts have construed this exemption to
encompass the protections traditionally afforded certain documents pursuant to evidentiary
privileges in the civil discovery context." Formaldehyde Inst. v. HHS, 889 F.2d 1118, 1121
(D.C. Cir. 1989) (citations omitted).  Among these privileges is the "deliberative process
privilege," which covers documents that are "predecisional" and "deliberative." Coastal States,
617 F.2d 854, 866 (D.C. Cir. 1980).  A predecisional communication is one that "occurred
before any final agency decision on the relevant matter." Nat'l Sec. Archive v. CIA, 752 F.3d

460, 463 (D.C. Cir. 2014).  A deliberative communication is one that "reflects the give-and-take of the consultative process."  Coastal States, 617 F.2d at 866.

Lantz concedes, as he must, that "the trademark application process is a deliberative process."  Pl.'s Mot. Summ. J. at 7.  But he contends that USPTO has not adequately explained why each piece of withheld information is covered by the deliberative process privilege.  In particular, he objects to the government's use of boilerplate justifications and its repetition of the same justification for entire categories of documents in its Vaughn index.

While Lantz is correct that USPTO's justifications are generic and repetitious, it does not follow that they are inadequate.  The very purpose of a Vaughn index is to allow the summarization of records without disclosing their content; some amount of boilerplate is to be expected.  Landmark Legal Found v. IRS, 267 F.3d 1132, 1138 (D.C. Cir. 2001) ("[A] Vaughn index is not a work of literature; agencies are not graded on the richness or evocativeness of their vocabularies.").  And when multiple documents "belong[] in the same category," the use of the same justification for an entire category of documents is acceptable.  Id. at 1138 ("It is not the agency's fault that thousands of documents belonged in the same category, thus leading to exhaustive repetition.").

With those principles in mind, the Court finds the Vaughn index here to be adequate.  All of the relevant records are emails, and the agency has provided the sender, recipient, and subject line for each.  That information, combined with USPTO's (admittedly generic) invocations of deliberative process privilege, provides a basis from which to conclude that the withheld material is deliberative and predecisional with respect to the "Eat More Kale" application.  As the government's declaration explains, the material includes "draft work product and internal emails in which Agency representatives are evaluating courses of action."  Siehndel Decl. ¶ 34.

Disclosing that information would "reveal internal deliberations among government personnel, namely, discussions of internal recommendations and opinions." Id. This sort of information is in the heartland of the deliberative process privilege and, therefore, at the core of Exemption 5.

## IV.  Conclusion

The Court wishes Mr. Lantz well with his documentary.  But he will have to make do with the existing set of records that he received from USPTO.  For the reasons set forth above, the Court will grant the defendants' motion for summary judgment and deny Lantz's cross-motion.  A separate order accompanies this memorandum opinion.


_____

CHRISTOPHER R. COOPER
United States District Judge

Date:  July 31, 2018